DAVID M. MICHAEL, CSBN 74031
LAW OFFICE OF MICHAEL & BURCH LLP
One Sansome Street, Suite 3500
San Francisco, CA 94104
Telephone:   (415) 946-8996
Facsimile:    (415) 946-8837
E-mail:       david@michaelburchlaw.com

Attorney for Defendant
EVGENI KOPANKOV

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO VENUE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br>vs.<br><br>EVGENI KOPANKOV,<br><br>           Defendant | Case No.: 0971 3:19CR00178-001 VC<br><br><br>KOPANKOV'S OBJECTIONS TO PSR AND SENTENCING MEMORANDUM |

## UNRESOLVED OBJECTIONS TO THE PSR

**1. Objection to Paragraphs 9 and 10**

This information is both not relevant and is very inflammatory against Evgeni Kopankov even though there is no evidence that he did anything wrong as to that incident. We would request that the PSR reflect the following true facts:

> Evgeni did not fly to the airport in Humboldt County with Mr, Edgar Garcia and his friends.  In fact, Evgeni never met Mr. Garcia. Evgeni was at the Holiday Inn Airport Hotel and planning a flight to Chicago later that evening. None of the seized currency was ever in the possession of Mr. Kopankov and he has never claimed that currency as his own nor is there any evidence that he even knew about the currency. Although a canine alerted to the currency, that is of little concern since all currency seems to be contaminated. No illegal conduct occurred in that incident. As the government agrees, Evgeni was never arrested or charged with or convicted of any crime regarding that incident and never claimed ownership of the seized currency. Law enforcement asked Evgeni a few questions, told him he could leave and that they would contact him if they had any further questions,  Since then, law enforcement has never contacted Evgeni about

KOPANKOV'S OBJECTIONS TO PSR AND SENTENCING MEMORANDUM - 1

that incident, As the PSR at Paragraph 11 reflects, Evgeni stated that the seized funds were another person's and not his.

We respectfully request that the Court direct that paragraphs 9 and 10 be modified to reflect the correct true facts.

**2.   Objection to Paragraphs 12 and 13**

Although Borisov may have said that Evgeni intended to "provide the guns for the robbery", there are no facts to support this representation. The facts related to that statement are that (1) there were no guns seized from Kopankov at the time of his arrest, (2) there is no evidence that Kopankov ever mentioned guns in any conversation or made any effort to obtain or provide any guns.

In addition, and in all fairness, the government's own evidence also shows otherwise. See, EK 0000216, at p. 7 - Conversation between Borisov and "Iko". Iko asks Borisov if Evgeni is going to go with Borisov and Borisov clearly states that Evgeni is only going to show the location and not go with him and Mr. Brooks, explaining that Kopankov does not have any cover-up – masks, gloves, shoes, hoodie, etc., and cannot buy in Humboldt County.

EK 0000216, at p. 11 – Evgeni not going with them. Meeting at airport so they can rent a car and leave in separate cars. (Note that Kopankov was driving a truck pulling a trailer). Then the informant asks why a full trailer ( the trailer is full with furniture),(and Borisov responds) because Evgeni is moving to a new location and Borissov is coming there to work.

EK 216 (the only recorded conversation between Kopankov and Borisov makes no mention of guns)

> "What are you doing? How far you got? You are in Nebraska? When do you think you will be in San Francisco? Monday Tuesday? Tuesday is tomorrow i cant get there Tuesday? Can you get us on Wednesday? Everything else is ok? Like 100%? Everything is there how it should be? We will be there Wednesday. I will tell you what time to pick us up.. OK, we agreed you picking us up instead of renting a car. Ok, good we'll figure it out. Ok ok bye."

EK 0000449-0000454, at p 3-4 – Iko and Borisov talking on 3/29/19.  Borisov states that only he and other guy going to do job.  Not Kopankov.  Iko complains that Kopankov is not going to do job. Calls Kopankov a "chicken".

Lastly is the Grand Jury testimony of FBI SA Rachel Hamilton, at p 19, where she testified under oath that Kopankov's only role was that he was going to show them where the property was.

There are other places and factual matters in the evidence that confirm that the only role that Kopankov was going to play in this plan was to just show where Victim 1 lived.  But the above citations are the most compelling.

Co-defendant Borisov's unsubstantiated claim, if it ever was made, that Evgeni was going to provide the guns drastically alters the seriousness of the offense as it relates to Evgeni. This unsubstantiated rumor by co- defendant Borisov will likely impact this Court regarding the seriousness of the offense and will also likely impact Evgeni's classification level preventing him from a camp placement.

We respectfully request that the Court direct that any allegations regarding Evgeni providing guns be removed.

**3.  Objection to Paragraph 14**

We respectfully request that the Court direct that any representation that Evgeni would drive Borisov and Brooks to any property or that he would participate in any form of kidnapping or robbery be removed. As set out above, all the evidence shows otherwise.  In fact, as Pretrial Service must know and as the government will agree, all such references were removed from the draft Plea Agreement and the following Plea Agreement, which was executed by Evgeni, was agreed to between counsel as exactly what the evidence would support.  The following Plea Agreement is what has been filed with the Court.

> Beginning at least as early as March 2019 and continuing on to on or about April 3, 2019, I knowingly and intentionally conspired with Emanoel Borisov and Paul Brooks to commit robbery affecting interstate commerce and to commit kidnapping. In March 2019, I agreed with my co-conspirators that Brooks and Borisov would travel from Chicago, Illinois to the Northern District of California to kidnap and rob Victim 1. They

planned to wait for Victim 1 outside of his residence. As soon as Victim 1 was outside of the gate to his property, my co- conspirators planned to forcibly take him to another location and hold him there, against his will and by means of actual or threatened force or violence, until Victim 1 told them the location of the drug proceeds. Once he told them the location of the money, they planned to take the money and split it amongst ourselves. I knew that Victim 1's money was proceeds from the marijuana trade.

**4. Objections to Paragraph 15**

We request that the Court direct that the following statement by the Informant be entirely removed:

> "[d]uring a meeting on April 1, 2019, Borisov called Kopankov and put him on speaker phone. The CHS heard Kopankov say that he was prepared to hurt Sergey if he had to. The CHS also stated Kopankov also stated over speaker phone that he would buy masks and bring them to the airport."

The reason we request that statement be removed is because there is NO recording of this statement despite the fact that EVERY conversation between the Informant and Borisov was done under the supervision of the government and every conversation was recorded. There is NO SUCH RECORDING of the above alleged statement made by the Informant. We believe it lacks any credibility and was completely fabricated to incriminate Kopankov, a feat for which the Informant was paid hundreds of thousands of dollars. We feel that it is unfair to include that unsubstantiated and self-serving representation in the Probation Report.

Another reason to remove that statement is that it is inconsistent with the recorded statements below.

> 1. EK 0000449-0000454, at p 3-4 – Iko and Borisov talking on 3/29/19. Borisov states that only he and other guy going to do job. Not Kopankov. Iko complains that Kopankov is not going to do job. Calls Kopankov a "chicken".
>
> 2 EK 0000216, at p. 7 - Conversation between Borisov and "Iko". Iko asks Borisov if Evgeni is going to go with Borisov and Borisov clearly states that Evgeni is only going to show the location **and not go** with him and **Mr. Brooks, explaining that Kopankov does not have any cover-up – masks, gloves, shoes, hoodie, etc., and cannot buy in Humboldt County.**
>
> 3  EK 0000216, at p. 11 – Evgeni not going with them. Meeting at airport so they can rent a car and leave in separate cars. (Note that Kopankov was initially driving a truck pulling

KOPANKOV'S OBJECTIONS TO PSR AND SENTENCING MEMORANDUM - 4

a trailer and that there were no masks or any other items that could be used to commit the offense in the possession of Kopankov at the time of his arrest.

4  Grand Jury testimony of FBI SA Rachel Hamilton, at p 19. Testified under oath that Kopankov was only going to show them where the property was.

Again, these unsubstantiated remarks in the PSR make Evgeni's involvement appear to be more serious and involved than it actually was.

**5. Objection to Paragraph 84**

We agree with the findings made in Paragraph 84 except for one phrase related to dangerous weapons or firearms, which we believe is not supported by the facts as we have stated above in our Objection to Paragraphs 12 and 13.  For those reasons which we stated earlier, we request that the Court direct that the phrase "...even though he had indicated he would be the one to bring them" be removed.

### DEFENDANT KOPANKOVS SENTENCING MEMORANDUM

**1. Evgeni's Personal History and Circumstances of the Offense**

Evgeni was born into a hard-working family in Bulgaria. His father owns a propane installation business and his mother is employed at a clothing company. Evgeni is extremely close to his family and speaks to his parents daily, often multiple times daily. He has been unable to return to Bulgaria for the past three years and misses his family terribly. Evgeni has never been in trouble, has a very strong work ethic and has worked continuously since coming to the United States as a young man of 22 or 23 in 2011 or 2012. For many years, Evgeni held two jobs. He obtained his U.S. citizenship in 2016 and has built a very successful trucking business through his own hard work. He shares a very strong relationship with his wife Maria, who has also worked continuously managing a salon and also helping Evgeni with his business. Maria is very close with her parents and her entire family supports Evgeni and have difficulty understanding how he could be involved in such an offense. Evgeni and Maria were preparing to start a family.

According to Evgeni's brother, Krum,

> "He somehow evolved into the bigger brother. I am proud of the person he became and honored to be called his brother. When we became adults and I met my current wife, Evgeni helped us acquire the home of our dreams and helped us financially to furnish our place. Ever since we had our two children, he has been a devoted uncle who does everything possible to ensure their wellbeing. I am aware of his plans to have a family of his own, which I hope he is given the chance to accomplish."

Evgeni's wife's cousin, Kristian Ivanov writes, in part,

> "Even though I reside in the United States, I spend most of my time in the Bulgarian community, which is still very conservative about homosexuality in general. When I arrived in Chicago five years ago at the age of 21 I was very afraid and shy to communicate with people. To me, the most important thing was that Evgeni did not push me away for their family and accepted me as a new, equal family member. He made sure to protect me from any verbal or physical abuse, which has happened many times and Evgeni has always been the first to jump in and stand up for me. I will forever be grateful to him for all that he has done and continues to do for the stability of my mental and physical health."

Evgeni's friend, Edita Todorova, writes, in part,

> "My name is Edita Todorova, and I have been a friend of Mariya and Evgeni since 2016. I unfortunately suffer from an autoimmune disease call Hashimoto. I shared my worries with Mariya and Evgeni and expressed that I am not sure where I should seek medical help. I could not hide my fear from either of them, but Evgeni took it upon himself to call friends and relatives that suffer for the same disease and connected me with them for help, guidance and support. Because of him, I came in touch with the right doctors and started taking the necessary medication. The reason why I am sharing this story is because we live in a world where most people are self-absorbed. Despite the fact that Evgeni is currently struggling with his business being slow due to the pandemic as well as his undergoing court issues, he made time to help me with whatever he could. I do no not have family here and I can honestly say its wonderful to know there is a male figure I can count on."

Evgeni's friend, Dr. Svetozara Zehireva, writes, in part,

> "I have known Evgeni since 2010 and his wife Mariya since 2005. They have been beside me during important life events. With a heavy heart, I can honestly say that I will never forget the fact that Evgeni helped me get out of an abusive marriage back in 2012 and was able to keep me safe from my now ex-husband, who was an alcoholic and drug addict. The hardships that Evgeni helped me overcome will not be forgotten. His acts of kindness did not stop at helping me emotionally and psychologically get over this toxic relationship and escape this awful period of my

life. In fact, Evgeni took it upon himself to help my now ex-husband find the help necessary to keep him alive, sober, and out of trouble by finding the right rehabilitation facility that can accommodate him in his hometown in Bulgaria. Even though he made a mistake, I believe he deserves a chance to redeem himself and continue helping others. I truly believe that Evgeni has a big heart full of compassion and kindness."

## 2. Evgeni Contributes to the Community

Evgeni has donated on several occasions to the Bulgarian-American Police Association for a scholarship for students to be able to attend college.

Approximately four years ago, Evgeni was told by the priest, who is also his friend at his church, that the church was in need of a new roof. Evgeni donated his time to the Bulgarian church in Chicago to help them build a roof. He also donated $5,000.

Seven or eight years ago, Evgeni was asked by his grandparents if he could help their church. Evgeni paid for a painting to be painted at the church.

Evgeni has helped many people. He helped his brother pay for an apartment in Bulgaria and made sure he had a car. Evgeni has always been focused on helping others, his family, young people, and the community at large.

## 3. The Circumstances of The Offense Involving Evgeni Are Mitigating

Evgeni met Borisov three or four years before his arrest. Borisov worked as door security for a nightclub. He was from the same Bularian community as Evgeni. Evgeni knew that in 2019, Borisov was down and out and needed work. Evgeni had purchased the property in Humboldt County and had started a legal marijuana grow business. He also had negotiated to purchase a second property for the same purpose and placed a $30,000 deposit on the second property. He was determined to become involved in this new business. However, he was still operating his trucking business and living in Chicago so he needed someone to manage, hire workers, etc. Evgeni had several conversations with Borisov about managing his grow and the purpose of Borisov's visit was to show him the properties and see if he wanted to move from Chicago to Humboldt Countyto accept the position.

Evgeni admits that Borisov started talking about robbing some guy but Evgeni never was interested and largely ignored these comments until Borisov pressed him. He finally agreed to show them an address to the supposed victim, but Evgeni said he had not even figured out where

KOPANKOV'S OBJECTIONS TO PSR AND SENTENCING MEMORANDUM - 7

this person lived and was not focused on that. He was arranging for Borisov to visit and focusing on trying to convince Borisov to take the job managing his grow.

Evgeni has never been associated with any violence and does not possess weapons. The rumors alleged by Borisov caused Evgeni's involvement to appear more serious and dangerous than it actually was. Consequently, the offense conduct grossly overstates the seriousness of Evgeni's involvement.

**Such statements not only impact the Court when considering an appropriate sentence, they will likely impact Evgeni's public safety factors and level of classification within the BOP and may prevent him from a camp designation.**

4. **The need for the sentence imposed to reflect (A) the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

   a. **Evgeni's Arrest Was Traumatizing**

   According to Evgeni, when he was arrested, the police did not identify the charges against him. When he saw the police he thought they were there to arrest the guys for the earlier incident. When he was arrested, he was scared and did not understand why he was being arrested. He was booked into the jail in Eureka and they were asking him questions about "the robbery". Evgeni did not understand the English word, "robbery." According to Evgeni, no one read him his rights or asked if he wanted to talk to an attorney. They kept asking him questions about Borisov. Evgeni tried to call his wife Maria, but did not remember her cellular phone number. He called another friend to ask him to contact her on facebook. He was placed in a cell with Borisov and Brooks for 2-3 days until they transferred him to Alameda County. He still did not understand the charges against him. Evgeni was so distraught that he did not eat or drink water for two weeks and lost 40 pounds.

   b. **Just Punishment and Protection of the Public**

   As noted above Evgeni's true involvement in this offense does not involve providing guns or threatening to hurt someone. It is imperative that the actual seriousness of his offense be

considered and that the resulting punishment fits the crime to which he was involved. Evgeni knows he should not have agreed to be involved in this scheme. However, as mentioned in paragraph 84 of the PSR, "there is no indication that the defendant had the ability to carry out such a plan given that no dangerous weapons or firearms were found on the defendant at the time he was apprehended by law enforcement"

Evgeni's lack of motivation to be involved and true lack of preparation regarding such an offense must be considered and weighed when determining a just sentence. There is no actual need to protect the public from Evgeni, in fact he has shown a generous propensity to donate time and money to help his community. With respect to deterrence, Evgeni's incarceration was so traumatizing, he remains resolved to never again violate any laws and risk incarceration.

5. **The kinds of sentences available and**
6. **The guidelines and**
7. **Policy statements**

As the court must consider all of the sentencing factors enumerated in 18 U.S.C. 3553(a), the Court is not required to impose a sentence in accordance with the guidelines.

    a. **The Sentencing Guidelines overstate the seriousness of the defendant's conduct**.

With respect to the guidelines, the total offense level of 24 is a correct implementation of the calculations for this offense. However, it is our position that the guideline overstates the seriousness of Evgeni's conduct. The government's evidence reflects that Evgeni was not going to go with Borisov and Brooks to kidnap the victim. While the guidelines direct that the robbery and kidnapping counts are grouped and the guideline yielding the highest offense level is to be used, **Evgeni's conduct was related to the robbery and not the kidnapping**.

Although the guidelines are correctly applied, it is our position that the guideline most analogous to Evgeni's conduct is the robbery guideline found in 2B3.1 The base offense level is 20 but, unlike the kidnapping guideline, it does not similarly award a three level reduction "because the defendant was about to complete all of the acts of the offense, but was apprehended by law enforcement". Therefore, even though not provided, it makes sense that the same consideration would be given for the robbery guideline. As a result, the appropriate adjusted offense level is 17. With a three-level adjustment for acceptance of responsibility, the total offense level is 14.

KOPANKOV'S OBJECTIONS TO PSR AND SENTENCING MEMORANDUM - 9

A total offense level of 14 and a guideline range of 15-21 months is the most accurate representation of the defendant's involvement in the offense.

**8. The need to avoid unwanted sentencing disparities**

As noted above, Evgeni's involvement in this offense does not warrant use of the increased guideline for kidnapping. Utilizing this guideline would indicate that his involvement was similar to other kidnappers. Such a guideline does not reflect his true conduct and would result in an unwarranted sentencing disparity.

**9. The need to pay restitution to the victim.**

There is no restitution owing.

## CONCLUSION

The Court must consider a sentence that makes sense and meets all of the objectives of sentencing. Within that context, it is appropriate for the Court to consider the unusual circumstances facing this country during this unprecedented time of the Covid pandemic and the rapid spread of the new variants.

**a. The dire situation in the prison system**

The Justice Department, itself, is taking preventative measures to combat the spread of Covid-19 in the prison system. Please see the attached article dated December 21, 2021, reflecting that 36,000 inmates were released on home confinement in order to combat the rampant spread of Covid-19 in federal prisons.
https://www.cnn.com/2021/12/21/politics/inmates-pandemic/index.html.

There have been 274 federal inmate deaths due to Covid!
https://apnews.com/article/federal-prisons- 5be574b4103a2f5420e0d9da2daf5c9c

Aside from the risk of death, the risk of being sick, being unable to breathe or obtain urgent medical care is traumatizing. Further, to prevent the spread of Covid, inmates are spending long hours in isolation which is contributing to mental health issues and suicides.

In addition, and as a consequence of the present dire situation, the BOP is experiencing an alarming amount of corruption and abuse by wardens, guards and prison staff as referenced in

the article dated November 14, 2021. https://apnews.com/article/federal- prisons-5be574b4103a2f5420e0d9da2daf5c9c

Simply stated, incarceration is a much harsher form of punishment today than it was three years ago. The Court must consider this fact when imposing sentence.

**b.   The possibility of home confinement and community service**

For the following reasons, and taking into consideration the present circumstances facing this country and the singular wrongful conduct of Evgeni and his ability to contribute to alleviating the difficult times facing all of us, it is respectfully requested that this Court consider the option of home confinement and community service

Since 2016, Evgeni has operated a successful trucking business. Prior to his arrest, his business was thriving, and he was earning $2,000,000 to $4,000,000 in gross income. His business suffered while he was in custody. Since his drivers were not being paid, they abandoned the trucks in the street and he was required to pay over $100,000 to retrieve them from towing yards. Some of the trucks were damaged. Upon his release, Evgeni worked hard to recover his trucking business. Then the Covid-19 pandemic slowed his business again. He has been having difficulty finding drivers and has been working long hours to try and keep his trucking business afloat. Due to his involvement in this offense, the banks have closed his business accounts.

The court must consider punishment as part of the sentence in this case. However, as previously stated, the punishment must fit the seriousness of the offense. Evgeni's conduct was indeed serious and he knows that he should not have agreed to become involved. However, he has never been involved in dangerous behavior, he is not involved with guns and he is not a danger to the public.  He has suffered trauma during his incarceration and damage and loss of his trucks while he was in jail, as well as the closure of his business accounts making it extremely difficult to conduct business. He deeply regrets his agreement to become involved in this ridiculous and potentially dangerous scheme.

Currently, the U.S. is short 80,000 truck drivers amid the supply-chain crisis. Please see the attached article. https://www.businessinsider.com/us-needs-truckers-trucking-association-president-says-2021-10#:~:text=The%20US%20has%20a%20shortage%20of%20around%2080%2C000,roughly%20 30%25% 20from%20before%20the%20pandemic%2C%20Spear%20said.

KOPANKOV'S OBJECTIONS TO PSR AND SENTENCING MEMORANDUM - 11

At a time when the BOP is releasing inmates to home confinement to avoid overcrowding amid the rampant spread of the Covid virus, and at a time when the country, as a result, has an actual and serious need for truck drivers, we request that the Court consider a sentence of home confinement and community service, with a requirement that Evgeni perform whatever community service deemed appropriate for him in helping to alleviate the supply-chain crisis and provide as many drivers as possible to assist the country's serious shortage of 80,000 truck drivers.

We live in extraordinary times.  Extraordinary actions must be taken to not only protect society but to allow even sentenced citizens the opportunity to be punished in a way that also helps to protect and to repay society.

Dated:  January 26, 2022

                                            Respectfully submitted,

                                            *s/David M. Michael*
                                            DAVID M. MICHAEL

                                            Attorney for Defendant EVGENI KOPANKOV

**CERTIFICATE OF ELECTRONIC SERVICE**

      I hereby certify that, on January 26, 2022, I caused to be electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                                *s/David M.Michael*_____
                                                DAVID M. MICHAEL

                                                Attorney for Defendant EVGENI KOPANKOV